Good morning, Your Honor, and may it please the Court. I'm Kevin McEwen, Counsel for the California Attorney General and the California Parties. The spelling is different from Judge McEwen and no relationship. We are not related. We are not related. No relationship. And no relationship. Judge McEwen has a W. I was guessing how you pronounced it, whether it would be the same, but okay. If I may, I will try to manage my own time, but I would like to reserve five minutes for rebuttal. Okay. Thank you. Thank you. In Harris, Port of Seattle, which is how we've short-formed the 2015 decision in this case, the Court affirmed FERC's decision that serves spot market that's short-term bilateral contracts with TransCanada and others during the 2000-2001 California energy crisis are entitled to the But the Court also recognized that the presumption can be avoided if there are traditional grounds for contract abrogation, such as bad faith, and the presumption can be overcome if the contracts seriously harm the public interest. We proved both at hearing at FERC, but FERC found the presumption neither avoided nor So central to my question here, which I want to start out with, let's assume that I agree with you that the ALJ applied the wrong definition of bad faith. But FERC both cited the correct definition of bad faith and set out your theory that TransCanada intended to take unconscionable advantage of CSRS in detail. Why then shouldn't I or this panel conclude that FERC applied the correct legal standard rendering the ALJ's any error harmless? Well, Your Honor, the standard, as you know, is the Utah law standard of bad faith, one of the flavors of which is intent to take unconscionable advantage of others. And breaking that down under Utah law, unconscionable advantage means absence of meaningful choice for one of the parties and contract terms unreasonably favorable to the other party. And if you look at either the ALJ's decision or at FERC's decision, you won't find much discussion of either of those points. The commission, FERC, talked a lot about the fact that they viewed our evidence as just a lot of evidence about high prices, but they didn't analyze the claim that we made under Utah law. Well, they didn't do everything you wanted them to do. That's true. But it seems that they understood what the correct standard of review was. They stated that. Oh, no question, Your Honor. They stated what Utah law was, and then they didn't apply it. That's our position. Well, the question of whether they applied it, what they stated it, they said, of course, high prices aren't enough. And they also didn't credit some of the evidence, you know, with Mr. Taylor, et cetera. So my question is this. If, as you acknowledge, FERC stated the correct standard, which is Utah law, and then proceeds through its analysis, even though there's not detailed discussion about unconscionability, what is the basis for granting your petition here? Your Honor, they said that they were going to decide whether TransCanada had engaged in bad faith, and then they didn't apply any of the standards that apply to that. And so our contention is that they used the wrong legal standard, and we also contend that they were looking for the wrong evidence. You concede they stated the right legal standard. Oh, there's no question that they did. But you contend in their analysis that they used the wrong legal standard. Right. The judge said that she was looking for fraud. That's the ALJ. Yes. Right. Well, and I think the judge said at the outset somewhere in the decision that Caliparte's claim was somewhat muddled and that there was some effort to smush all these together, but then there was a detailed separation of the claims, as I read it, as she went through it. And that's where I think your argument is that in talking about bad faith, she, in effect, infused a fraud standard. Is that right? Yes. And so the standard is bad faith, unconscionability. But she looked for fraud. She looked for fraud and that's what FERC said when they affirmed her decision. They said there's no evidence of fraud here. And then, and I don't want to get off your point about the standard, but then the principal source of evidence that they have, especially now on appeal, are now touting, is that the transaction confirmation tapes between TransCanada and the CSRS representatives didn't reveal any evidence of, now we don't know what she was looking for because she said they didn't reveal any evidence of bad faith, but she was looking for fraud. Our contention is that's just not even possible that you would find evidence of unconscionability in these tapes. These are very short conversations in which people are, people on either side are confirming the price, the quantity, the delivery time, et cetera. And, you know, there's little conversation between the people. These are like little phone conversations, right? Well, some of them are a little chatty, but mostly they're all business and they're getting down to confirming for the purposes of the WSPP agreement. That's the way it works. In that regard, is it a situation where your gloss on the tapes is different than the ALJ, or you just don't think that they should be what the ALJ termed as best evidence? Exactly. The latter. The ALJ's decision talks about the tapes as a final conclusion. She just sort of tosses it out. And I'm not saying, I'm not trying to minimize it, but she, you know, she clearly, she listened to the tapes or read all the transcripts and concluded that there was no bad faith indicated on those transcripts. My point is there never would be. If you look at the elements of bad faith, unconscionability, you're looking for evidence of the weak bargaining position of the buyer. That would never come through in one of these tapes. The CSRS representative is not going to confess that he's up against the wall, but indeed they were. They were trying to buy power, you know, thousands of megawatts of power. Okay, but under contract law, are high prices and high margins alone enough to establish unconscionability? Your Honor, under the Utah law standard of unconscionability, it's extracting an unreasonably favorable price term. So can I ask you about that, Counselor? So the reason they were talking about Ryan and the Valcarce, is that how you say that? I always called it Valcarce, but I'll take Valcarce. So the reason they're talking about that, I assume, is because that was what you all presented to the ALJ as the correct standard. Right, but the... So, but it's a, there's some things that are strung together. Because as I see it, and I don't know that you would disagree with this, your claim is really an unconscionability claim. It's the unconscionability sub-part of bad faith that you pull from Valcarce, you know, one of the three. Correct. One of the three. But there's very little talk about that in that case. So what you then do is you go to the Ryan case, but the Ryan case is not a bad faith case. It just has more about unconscionability, but it's a very different context. And in fact, Valcarce is a different context too. I mean, Valcarce is, you know, I sue you in bad faith, a bad faith lawsuit. I sued you in bad faith, and so you get your attorney's fees when I... Why does it not make more sense, when I'm thinking of the bad faith claim here under Utah law, I would think of something like the duty of good faith and fair dealing. That's never talked about unconscionability. So let me make sure you understand my concern. I'm not sure why, I'm not even sure that your attempt to try to pull unconscionability in, in this context, really, because you've got several steps in your, first of all, you're not really looking, I think, at the most applicable bad faith part of Utah law, which I would think would be the duty of good faith and fair dealing in the contract context, which would be these insurance cases. So you start with Valcarce, but then that doesn't say hardly anything about it. It just happens, luckily for you, have the word unconscionability. Then you go to a completely different context and you grab what unconscionability is. I'm just not sure I can travel that far with... And then your complaint is, they didn't do a full unconscionability analysis. I'm not sure that you're right that Utah law in this context, in this bad faith context, would incorporate this unconscionability concept that you pulled from Ryan. Well, Your Honor, FERC accepted our exposition of the law, if you will. And on the issue of... Your argument is kind of, they didn't, at least it's like, you know, you're right, they gave a lip service. But then your argument is that they only applied, they basically only applied bad faith, which, which they only applied the more fraud type concept. And what do I, let me ask you this, what do I do if I think, okay, what if I agree with you? They only applied a fraud type concept, but I think that that's what Utah, that's what Utah law requires. I think you need to remand it to FERC and ask FERC to apply the law correctly. If that's your conclusion. But your view is that they did, I mean, I think under that circumstance, your view is they did, but kind of accidentally. They gave lip service to Ryan because you quoted Ryan to them, but then they just basically did what I, under this circumstance, did what I think was actually the right standard. Well, I will say this, Your Honor. We tried to present evidence of state law, good faith in dealing testimony and, and make that argument and FERC excluded it from the record. FERC said, we're not going to deal with state law, good faith concepts here. They just wouldn't allow it. Why? I wasn't aware of that. Why? It seems like good faith is the flip side of the bad faith coin. So like, why would they, why would they do that? I can't explain that, Your Honor. What I do know is that the way that FERC analyzed this doesn't follow. It simply doesn't. Doesn't follow Ryan. What you're saying is they did not apply Ryan, I think. I mean, because, because, well, Carsey, I looked, I had my clerk look, and I, I didn't find any case where Utah has ever done what you have done and what you asked the agency to do, which is to basically marry the two together, Ryan. And there's one case that cites both Val Carse and Ryan, and it cites them for two different claims and two different, two different types of claims. It doesn't marry the two together like you're trying to do. And so I guess what I'm trying to figure out is if I think that you've got Utah law wrong and maybe luckily FERC applied it correctly by not getting into the unconscionability weeds that you're saying they screwed up by not getting into, what do I do with that? I guess you're saying, well, the fact that they may have luckily got it right, I still should remand it for, for them to say, okay, to more clearly what Judge Van Dyke said during oral argument. Well, Your Honor, the third leg of our argument here is that they look for it in the wrong place. They look for the evidence in the wrong place. They look in these, in these trader tapes. You're never going to find evidence of the bad faith that I have described in our, in our, in our papers in these tapes. You're just not going to find it. It's not the, the, the, the, the, the seller. Even the, even not the unconscionability type, but the, the fraud type you're never going to find. Well, you, you almost always would need evidence from outside of these tapes for, for, for any of these things. I mean, I suppose you could catch somebody in a lie. I think FERC has, has not gone down the fraud route necessarily, but it, it basically says we apply Utah law, and then it goes through the evidence as to whether you can overcome a presumption. So the question I have is if it applied, if it stated the correct law, where did it go wrong then in its findings and its application of the evidence? It did not look for the elements of unconscionability per the Ryan case. Well. Well, yeah, okay. So if, if that's the only thing that we can't divine whether their unconscionability was in the background of its determination, then you would want us to remand and FERC would take the evidence already on the record, right? And march through it in an additional legal standard? The correct legal standard, yes. What you think is the correct legal standard. Right. I guess, I guess I'm a little more simplistic even on this. I understand your theory that TransCanada's high prices and high margins raise an inference that TransCanada intended to take unconscionable advantage of CSRS, if that's how we say it. By applying the substantial evidence standard of review, aren't we compelled to uphold FERC's decision to the contrary, especially given that there was evidence that TransCanada's prices were in line with and in fact lower than the prices of other Your Honor, they were not the highest charger, but that doesn't exonerate them because just as an example, the other high chargers to CSRS at the California-Oregon border where all this power was delivered to CSRS, who was purchasing it on behalf of the ISO, were sellers who were charging similarly unconscionable prices. They just were a little higher. Power X, Sempra, Coral, there's now Shell. We've settled with all those people. We haven't settled with TransCanada. The fact that TransCanada was extracting similar but a little bit lower unconscionable prices, taking advantage of CSRS that had its back against the wall and had to buy all the power the ISO needed to avoid blackouts, that's the situation. So it's not, I would say, FERC simply didn't consider the problem. It got Mr. Taylor's test wrong. It dismissed his test as simply talk of high prices when in fact what he did was go out and get the highest price. Well, I want to make sure you have enough time, but I just want to make sure that so FERC and the interviewers can, as I see your argument, they cited the right standard. You've said that multiple times. You've agreed to that several times. But you're saying other than that, they just didn't do anything. So I don't know if it's that they didn't consider the problem because in theory, citing the right standard would be considering the problem. You're saying they didn't show their work. Is that really kind of your argument? They just didn't, like to the extent that we don't know whether, you're saying, we don't know whether they applied the Ryan standard because other than citing Ryan, they never showed any work doing that? Right. They gave reasons, but the reasons don't make any sense. They don't hold together. And our argument is that they used the wrong standard with the wrong evidence, looking in the wrong place, and got the wrong result. So it's, these are, I think that's not a substantial evidence issue. I think it's a mental problem with the, an analysis problem with the way in which the Commission decided this case. So make sure I understand. There's two different ways you could go after that. You could say there is no way to get from point A to point B, which sounds like what you just said, basically. If they applied the right standard, there's no way to get from point A to point B. Is that the concern, or is the fact that they just didn't show their work, even if they could get from point A to point B, they didn't show their work, and so we Well, they certainly didn't show their work. If you're looking for fraud, let me ask this. If we conclude they could get from point A to point B without showing their work, should we uphold? I would say no. I mean, FERC is under a requirement to give you reasons why it made its decision, and its reasons don't make any sense. I mean, your argument is that in the administrative context, we can't really substitute our evaluation of the evidence for the administrative agency, even if we would agree with the administrative agency. But beyond that, when they give reasons, you have to rely on the reasons they gave. And the reason, what we're saying is the reasons they gave don't hold together. So it would be, you know, sometimes a court can substitute the right result for the wrong reason and run with that, but in the situation of an administrative agency, what you've got is FERC is bound by what it said, and what it said doesn't hang together. I notice that I'm running out of time, and I know that you're out on this issue. Well, you are. I'll give you some time for rebuttal, but I've totally ignored my other issue, which is the overcoming issue. So there's another issue in this case. We would, and I'll just briefly try to outline it. The other issue is that you can overcome the mobile CR presumption if you can show serious harm to the public interest. And what FERC did here was minimize the harm in two ways that are just inexcusable, in the sense that they made the presumption irrebuttable. You know, the mobile CR presumption is a rebuttable presumption. FERC did two things that make it irrebuttable. The first thing is that they measured the harm on a contract-by-contract basis. You know, these are very short-term contracts. And so, and FERC reduced it to cents on a utility customer's bill. So you're looking at cents or mills, even though you have contracts that are overpriced. Well, what I understand your argument to be, since we are getting low on time, is you argue that $4.97 billion imposed an excessive burden on consumers, even though it presumably added only $1 per month to the average California utility bill. Is that? That's a fair way of saying that argument. That's your argument, right? Yes. And so the, I guess, what objective or administrative standard can we apply to disagree with FERC's conclusion that the burden was not excessive? Because you want to basically argue, well, we mitigated it by passing bonds, and therefore, you know, we should, it really was, it was an excessive burden, but we just stopped the burden. And FERC basically just said, hey, it wasn't a burden because it was only added a buck, right? Yes, Your Honor. And my point is, by looking at the problem in this way, you're rebuttable for short-term contracts. It's, you know, this court decided, and we're certainly not challenging the decision from 2015, that the Mobile Sierra presumption applies to contracts. It doesn't make any difference whether they're short-term or long-term. It applies to contracts. Okay, so now we have these short-term contracts, and the standard is, do they cause a serious harm to the public interest? When you do what FERC did, which is reduce this dissent on the utility customers bill, number one, by looking at these short-term contracts on a single contract-by-contract basis, number one. Number two, we tried to group the contracts together, because these are $5 billion of overcharges that the California government put into bonds in order to spread out the harm over 20 years. And that happened. FERC said, well, that means there's no harm. You've taken care of the problem. They haven't taken care of the problem. They've just spread it out over 20 years. It's the same problem. And so it caused serious harm to the public interest. Then, if it had been passed through to consumers, it would have been utterly disastrous. That's what happened in San Diego at the earlier part of the crisis in the summer of 2000. And it was bedlam. People were, you know, homeless, and it was just the – and that was because San Diego's gas and electrics rates were not kept. Well, I think we understand your argument on that. So you're two minutes over. I'm going to give you three minutes for rebuttal. Okay? Thank you. All right. So we will move to, I believe, is FERC going to go first? We can't hear you. You can't hear me? Now we can. May it please the court, Lona Perry for the commission. You have to, in viewing the question of the bad faith analysis in the commission's orders, you have to view it from the perspective of California parties having the burden of proof to demonstrate that there was, in fact, unfair dealing in the contract formation stage, which is required by Morgan Stanley. And when the administrative law judge was evaluating this argument in paragraph 1388 of the initial decision, which is in the excerpts of record at 589 to 590, she outlined exactly the arguments that the California parties were attempting to prove, which is there was exploitation of CSRS by TransCanada by charging prices above market level, well above, and because they knew they lacked alternatives. Well, I think the problem is that she used a standard that isn't found in Utah law. When she says at paragraph 1390 that it has to be an act of fraud or deception prompted by a sinister motive. So the question I have is even if FERC comes along later and parrots a case out of Utah law but then doesn't apply it, how do we know that the ALJ's findings weren't, in fact, kind of infected by this misapprehension of really mixing and matching fraud with unconscionability? Your Honor, I don't believe there was any misapprehension. If you look at 1390, the administrative law judge is quoting from TransCanada's brief. But then in 1391, the administrative law judge goes on to say the California parties provided definitions for the various standards. And we find that they did provide the appropriate separate legal definition for bad faith. And in that she quotes, she cites to the California parties' initial brief at 22. So do you think the ALJ got it right? Yes, Your Honor, because that's why I'm pointing to paragraph 1388 in the initial decision. Because she completely understood what the argument was. Well, I think, but see, I guess I don't agree with you that the ALJ got it right. So I'm just going to tell you that right now. So to prevail with me, I think Judge Van Dyke characterized, FERC cited a correct standard but didn't show its work. So that's why I would need to know that. I would be looking at the record to make sure that how do I know that FERC applied the correct legal standard and corrected the ALJ's error. But you're hanging tough on the ALJ didn't make an error? Your Honor, when she considered the California parties' argument, she expressly considered the argument that bad faith. Well, can you say yes or no? Did the ALJ err on the standard? No, Your Honor, I don't believe she did. But then why did FERC, but then FERC seemed to think that the ALJ did because it cited a different standard. The ALJ, the commission cited to paragraph 1391 where the ALJ said the California parties expressed a correct statement of the standard. And they affirmed that. If you look at paragraphs 96, excerpts of record 47, paragraph 78, these are in the hearing order, excerpts of record 38 to 39, and in 537, paragraph 144, excerpts of record at 130, the commission understood that the ALJ was applying the Valcarce-Valcarce standard. And if you look, they cite to, in particular, the initial decision at paragraph 1419. That's right, counsel. That's right. But as I understand it, California's whole, all their eggs are in one basket on this, which is unconscionability, which is not really Valcarce because it just has the word unconscionability in it. I haven't really seen any case actually apply that standard from Valcarce. It's Ryan that they're relying on. And FERC does cite Ryan, but I'm not sure. Do you think that the Ryan standard applies here? Because Ryan is not a bad faith case. It talks about unconscionability but in a totally different context. So do you think Ryan is the right? And then if you do think it's the right standard, then I'd like you to directly address what their concern is, which is, yes, FERC cited Ryan, but we don't see anything in FERC's decision that actually applied that unconscionability standard. And I think they go further and they say, and there's no way you can get from point A to point B. You can get from, if you're applying that standard, that you could actually have reached the result that FERC did. Thank you, Your Honor. I think that the commission absolutely was looking at, because the California parties were making their case for their burden of proof under this Valcarce standard, the commission looked at whether it had been satisfied. And the point that, the evidentiary point that demonstrated that it was not satisfied, as Petitioner's Counsel just said, they had to show basically the weak bargaining position of the buyer, that they were in a position to be taken advantage of or held over a barrel, so to speak. And the administrative law judge specifically found, as to the trader tapes, and she reviewed every single one of these negotiations, she said, as to the trader tapes, the best evidence of actual contract negotiations, they didn't show any such thing. They showed that TransCanada was a price taker in some of the negotiations, that the California scheduler turned down offers from TransCanada in some negotiations, that the California scheduler exercised its right not to accept delivery on contracts that they made, that the scheduler refused to trade with TransCanada on some occasions. And the administrative law judge concluded that these types of things did not indicate the weak bargaining position of the buyer or being held over a barrel. It was what the California parties were trying to hold. Can I just stop you for a minute, because your answer really sidesteps what I think Judge Van Dyke's question was, and what my question is, is, you know, the commission brief doesn't really engage with the unconscionability argument. So that's where it's like this gap in the commission's position as you're taking it now. So I'm still having trouble understanding. They state the standard, and, you know, there's a correlation between unconscionable advantage and Valkyrie and also the absence of meaningful choice in Ryan, their related concepts. But where do you and your brief or the commission in its decision directly address unconscionability? Well, we directly address the concept of there not being over a barrel. We didn't use the magic word unconscionable, but we directly address that argument. And if you look at our brief at page 28, you will see there that we talk about this finding by the administrative law judge and all of the evidence in the trader tapes that there were alternatives available to the California scheduler in entering into these negotiations with TransCanada, none of which supports the California party's argument that they were under some sort of duress in these negotiations. So, I mean, I guess the bottom line is you didn't really, the commission doesn't really use the word unconscionability, correct? No, Your Honor. The commission doesn't use the word unconscionability. I mean, and so we're having a little trouble on appeal. If that's the fundamental standard, you're saying, but these translate into lack of unconscionability. Do you want me to finish my question? Yes, Your Honor. Thank you. No, let me finish my question. She wants to finish her question. I want to finish my question. Okay. That's a problem with video. Yeah. So just pause. There's a little pause. So, I mean, the difficulty we have on review is discerning whether, in fact, if we take unconscionability as a baseline standard, whether FERC, in its decision, although it cited a case, whether it actually went through the unconscionability analysis. And that's really our challenge here. And I'm having some trouble finding that. You're piecing together different things it said that you say are tantamount to an unconscionability analysis. But it didn't talk about unconscionability. I mean, it's like, what, avoiding the elephant in the room? So where, in your view, are the best paragraphs in the FERC decision that address unconscionability, albeit not with that word? Well, I think beginning with the administrative law judge's decision at 1388, which is in the excerpts of record at 589 to 90, where- Can I just stop you? My question is, where in FERC's decision, not the ALJ? Okay. Well, the commission specifically affirmed the ALJ's conclusions on this in 537 paragraph 147, excerpts of record at 131, and rehearing order paragraph 97, at 47, affirming the ALJ's conclusion that the California parties failed to meet their burden of proof on this because of the evidence of the traitor tapes. And the traitor tapes failed to show the kind of bad faith that the California parties were alleging. Okay. So then to engage with Mr. McKeown's argument, he's saying that wouldn't be where you would find evidence of this absence of meaningful choice or unconscionability. What is the commission's position on that? Because I understand that the ALJ was quite direct, saying best evidence, and here it is, and that's adopted by the commission. But he makes a different point, as I understood him, to say that's not evidence of where you're going to find this unconscionability. His argument that this isn't where you're going to find unconscionability is that nobody is expressly saying threatening things, that I am going to take advantage of you, or you have to take my price. Well, okay, you have the traitor tapes, but I'm not sure that they exactly foreclose the possibility that TransCanada intended to take unconscionable advantage. Because why would you expect TransCanada to be overt about its intentions? It's not overt about its intentions. That's not what the traitor tapes show. What the traitor tapes show is that the California scheduler had alternatives. They turned down TransCanada. They dictated the price to TransCanada. They refused to accept delivery on contracts they had entered into with TransCanada because they got a better deal elsewhere. The point is the traitor tapes don't show that TransCanada had any kind of market power. I guess we're talking past each other because I really feel like I was more confident in an affirmance coming into this than I am after your I was hoping that you were going to better string together how FERC showed its work, that it considered the correct things. I want to give you one last chance. How do we know, looking at FERC's decision, that it applied the right standard and considered unconscionability? Even though it didn't use the word, how do we know that? Because, Your Honor, it directly addressed the California party's arguments about unconscionability, how they said that unconscionability was demonstrated by these transactions. And they directly addressed those arguments in the orders. Okay, so I guess if I'm not, then is your argument they stated the right standard and they set out correctly what the arguments of the parties were? So we should know from all of that that their conclusion was consistent with appropriate law. Is that what you're saying? Yes, Your Honor, they set out the standard, they set out the argument that California parties were making under that standard and they demonstrated how, with reliance on the traitor tapes, that the California parties had not demonstrated that their factual assertions were true. In fact, it was to the contrary, that it appeared that the California scheduler, in fact, had options. All right, we've gone two minutes over on your part. I want to make sure my colleagues don't have additional questions. I have a question for FERC. So we'll try to make this quick, but it is exactly about FERC, so I'd like to hear your. So on the other issue, on what I call the death by 1,000 or 100 cuts argument, it does seem FERC's position that you go contract by contract seems odd to me because it seems to me like in determining whether there's a harm to the public interest, because these are small, I mean, I'm sure they're actually huge contracts, each one, but why would you not look at them all together because the injury would seem to be something that's cumulative, not any one single contract, plus it seems very difficult to actually look at the harm from one particular contract. That's the first question. The second question is, and it goes to the second point that counsel on the other side was making, if you are, I don't quite understand the concept of if you run over my car and my insurance pays for my car, why you haven't harmed me. And so that seems to be sort of FERC's argument is, yeah, even if there was $4.7 billion worth of damage here, California bailed everybody out or did something or spread it out, you know, they went and got a loan and spread it out, and so that means they didn't get harmed. Boy, if that's the case, then basically as long as somebody does something to, you know, rush to the ambulance, then that means that they didn't have harm. That seems, I don't know, hard to find that that's a very good standard. So does that make you got my two questions? Basically, I'm struggling to see FERC's position on the two last issues that your counsel on the other side talked about. In the first instance, the commission found that the aggregate harm wasn't the appropriate standard because Morgan Stanley specifically says the mutually agreed upon contract rate seriously harms the consuming public or the contract rate must seriously harm the public interest. And if you look at Morgan Stanley at page 552 where they're giving the commission directions about what to do on remand, they say that you must look at the immediate impact of the contract rate and the impact of that contract rate down the line, but there's no contemplation of you look at any aggregate impact on the buyers from the overall impact of the market. You're reading Morgan Stanley like it's a statute. Yeah. You know, you're kind of reading Morgan Stanley like it's a statute, not like it's, you know, it's hard for me to believe that they were thinking of, oh, yeah. In fact, didn't you say rates as in plural? I mean, I don't have the Morgan Stanley right in front of me, but if it's rates in plural. Agreed upon contract rate. Rate? Singular? If you look at page 545 and 548, they say the mutually agreed upon contract rate or the contract rate. Well, if you, I agree with Judge Van Dyke. The kind of precision you're hearing really doesn't hold up if you go back in time because if you look at FBC versus Sierra Pacific Power, which was one of the sources that ultimately ends up in Mobile Sierra, they talk about contract rates in the plural. So I'm not sure you want to rest your case on an S that appears in one case but not another. Well, I think you also, it's important to point out here, Your Honor, that even though the commission found that reliance on the aggregate damage was not sufficient, but it also affirmed the administrative law judge's findings that there was no burden from the trans-Canada contracts as a whole. I think that's your better argument, but what about the you run over my kid, but I took him to the hospital and they patched him up so we're all good?  The commission made findings about aggregate impact with respect to multiple respondents and found that it was 0.069 cents per month on consumers' bills. And so the commission wasn't saying just because you did the bond issuance that we don't look at that. What the commission was saying was you have to look at the impact on the consumers. And the commission found that as it turned out, that the impact on the consumers was not severe enough to constitute an undue burden. Well, I think the commission found that California hadn't presented enough to reach that conclusion. Yes, Your Honor, and again, it is California's burden of proof. And ultimately the commission's decision on both of these issues was that they had not met that burden of proof to show either avoidance or overcoming of Mobile Sierra. I just have one procedural question I could ask to any party, but I'll ask Burke. We have left here just a tiny part of this huge challenges in the energy crisis, most of which went through directly or indirectly the court's mediation process that was set up. Did this case go through that process? I don't believe so, Your Honor. Okay. Well, I can ask. Mr. Sundback can correct me. Mr. Sundback or Mr. McEwen, I can ask. So thank you. Okay. Are we done? Okay. I think we've taken you quite a bit over, but you answered the questions. Thank you. Okay. Now, as promised, Mr. Sundback, you have seven minutes. May it please the court, good morning. Mark Sundback from Marina Paints Canada Energy. There's a lot to cover here. Maybe we would take up unconscionability first, if that's acceptable from the panel's perspective. FERC did set forth the argument that it applied with regard to unconscionability in its orders. It reviewed the evidence that California had choices. That's outlined briefly in our brief at pages 11 through 13, if memory serves. The tapes do provide useful information. It may not be determinative in every instance, and that's why the complainants had an opportunity to supplement the evidence, at which, according to both tribunals, they failed. It's important to realize also that some very useful information was contained in the analysis of witness Fox Penner's testimony in the initial decision, which notes, albeit in the context of claims of undue discrimination, nonetheless some very persuasive data demonstrating that TransCanada was not discriminating or singling out CSRS or whatever label that the California parties are trying to apply today to those transactions. And that portion of the ID appears at excerpt of records 0594 through 0599. So, Counsel, how would Trader Tapes demonstrate any of this stuff? I mean, I think we all acknowledge that it's probably not going to say on the Trader Tape, well, you really got me over a barrel here, but I'm forced to, so I'm going to take the rake. So how would they – I'm not – maybe they can demonstrate it. I don't know. But how would they demonstrate it? There are any number of phone calls where CSRS, like the California Energy – the agency states, well, we don't want the power at the price at which you're offering. Alternatively, we don't want the power unless you can come down to our price. Those are two examples where it's quite obvious there's no market power, where there's no duress or bad faith. So – and there are instances, very occasionally, not very frequently, where a trader will say, gosh, I don't have a lot of choice in this. There's one conversation, and I apologize, I don't remember the record site, but it's with SEMPRA. CSRS is talking to SEMPRA and telling SEMPRA, we have no choice. There's some other pejorative language in there, but – Did FERC apply the same standard as the ALJ? It applied – as to unconscionability, it, as we understand it, modified the standard that was being applied by the ALJ. So the question I have then is when FERC is really adopting the findings of the ALJ, if the ALJ was going down the wrong path on the standard, whether or not those findings have some inherent – potentially inherent error in them. Two thoughts, Your Honor. One, the genius of the administrative system is that it does create the opportunity for adjustment as it moves up the, if you will, administrative food chain. Second, as this court itself has reaffirmed, citing Morgan Stanley, in which this bot was voiced in the opinion, there are no further acts that are necessary on remand where, quote, And the U.S. Court of Appeals for the Ninth Circuit cited that holding in a case styled Gutierrez Zavala v. Garland. I'm sure I butchered that name. I apologize. Case number 20-73398 issued April 26, 2022, slip opinion at 8. So, I mean, if the – that's a frequent issue in immigration cases, but this is a little more complicated than most immigration cases. If – are you saying that if we were to remand and say to FERC that there is this unconscionability standard and we can't divine it from your opinion, that that would be idle and useless and FERC would just come back with the same opinion with the word unconscionable in it? Your Honor, there is overwhelming evidence that directly addresses the merits of what the California parties are alleging constitutes unconscionability in this record. They have had months in this case of hearings to put their evidence in and make their legal arguments. Could I ask you then, if we were to affirm here, would we be saying that the evidence is such that it's, albeit no specific reference, that the evidence is such that it relates to unconscionability and therefore meets the standard? Is that what we would have to say to affirm? That would be one avenue, Your Honor. Of course, as you know, the Federal Power Act provides that on appeal, findings of fact based on substantial evidence are conclusive on the appeal. So, we have an extraordinarily rich record from which to draw. And thus, we think that if there's legal error, especially if there's legal error that can be corrected at this level, then it's appropriate to do so rather than to go back, goodness, how long did this take on the last remand? Too long. Yes, I'm not going to be practicing nine years from now. So, are you saying that we would have to say it was harmless? It is a type of harmless error, Your Honor, because the fact that the record is so rich. Okay, if I could just briefly, having touched on unconscionability, the poster child of unconscionability according to the petitioner's brief. Let me just, one moment, your time is actually up. Okay. So, I've got, it depends on, we don't have any additional questions, so I'm going to give you one minute to wrap up. The March 20th transactions, if we look at the actual transcripts that are cited in the petitioner's reply brief, starting at about FER 100 through FER approximately 135, show that most of those volumes were not from Alberta, which is the price average that they give you to start off the discussion in the brief, but rather from Portland. And if you would look at the record, SER 258, which purports to show costs that were charged in the Portland Pacific Northwest market area, you'll see that those were much higher than the average Alberta price that's being dished up to you at the beginning of that discussion. So, we'd submit it's misleading in that regard. The petitioners in no way contest that the Alberta market didn't establish the cost of the supply before the supply was purchased, and their witnesses admitted they had never quantified the impact of that risk on price or what that should be. And while that was uniquely risky on the supply side, downstream we had a uniquely situated, as euphemistically deemed by the ID, purchaser that experienced extraordinary risks, many of as a result of the decisions made by state participants, including the CPUC, now appealing, and the utilities, now appealing. So, it's a market formula of unprecedented risk. No one else was buying in the Alberta power pool and bringing that power to Oregon to sell, plus we were selling it to the most risky entity in the Pacific Northwest. So, we'd ask you to consider that in assessing unconscionability and the March 20th transactions, which were actually mostly fulfilled by Portland supply for hundreds of dollars more than the $66 number that's offered to you in the California party's reply brief at page 19. Thank you for your indulgence. All right, thank you. All right, we'll go back to, I'll give you three minutes, but if we have additional questions then it will take whatever it takes. Thank you, Your Honor. Your Honor, on issue one, unconscionability, bad faith, FERC didn't show its work because it didn't do the work. I think that's the takeaway here. They did not apply unconscionability analysis. They just didn't do it. On issue two, the overcoming issue, FERC has a duty to protect consumers. It's its primary purpose. And it failed here, it just failed entirely on the overcoming issue to grapple with the critical aspect of the problem. And the critical aspect of the problem is you've got to somehow conform the Mobile Sierra analysis. If it's going to apply to these hour-long, not extremely large dollar-wise contracts, I mean all, they're very large, but they're not billions. You've got to somehow apply the standards so it's not irrebuttable. You can't have standards like this that are not rebuttable. And if the presumption is going to apply, FERC has to do the work to figure out how to do it so it's not irrebuttable. But it is here, at least the way they did it. Another point on Morgan Stanley, and this goes to my issue of what FERC could have done. We know, and we cited the cases in our brief. We've discussed them back and forth in the briefs. But FERC, when it wants to, finds the Mobile Sierra presumption overcome on a fairly regular basis. It's just when FERC wants to do it. And the way it does it, oftentimes, is by groups of contracts, whole groups of contracts. So we cited them in our briefs, and FERC could have done that here. You know, what FERC said in response to us is we weren't required. Exactly. I was just going to ask you, they could have, but are they required, and particularly now under the standard of review? And my point is it's absolutely required in this context where the Mobile Sierra presumption is being applied to these short-term contracts. Otherwise, by insisting on the contract-by-contract analysis and ignoring $5 billion in overcharges that were passed through to consumers, they're not doing their job. So if we were to agree with you on whether or not they showed their work and said they didn't show their work, and if it were to be remanded, then I assume we wouldn't need to decide these Mobile Sierra issues at this stage, correct? I would say that's correct, Your Honor. But if FERC did show its work in a remand proceeding and came out the same way that it has here, then those issues would be back on the table, is that right? They would, yes. And you seem to have some answer to my question about the mediation status. It was enormously successful, Your Honor. The Court ---- Oh, I understand. But I'm asking about this claim, this piece we have left. We've attempted to settle with every single seller. Okay. I don't need to know the details. We wall ourselves. We wall ourselves. I just wanted to know if it went through the Court's process with Judge Levy. We did not have face-to-face discussions with TransCanada. Okay. Okay. We don't appear to have any additional questions, so that will conclude argument in this particular case. Thank you.
judges: McKEOWN, CALLAHAN, VANDYKE